**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Clinical Notes AI, Inc. d/b/a Clinically AI, <br><br> Plaintiff, <br><br> vs. <br><br> Ryan Owens, <br><br> Defendant. | Civil Action No.    3:26-cv-01546-CMC <br><br> **VERIFIED COMPLAINT** <br><br> *(**Jury Trial Demanded**)* |

Plaintiff Clinical Notes AI, Inc. d/b/a Clinically AI ("Clinically AI" or the "Company"), complaining of Defendant Ryan Owens ("Owens"), would respectfully show unto the Court as follows:

**INTRODUCTION**

1.      By this action, Clinically AI seeks damages for, and temporary, preliminary and permanent injunctive relief against, the actions of Owens pursuant to the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836; the South Carolina Uniform Trade Secrets Act (the "Trade Secrets Act"), S.C. Code Ann. §§ 39-8-10, *et seq*.; the valid and enforceable contractual agreement between Owens and Clinically AI; as well as the statutory and common law of South Carolina and, where applicable, Connecticut.

2.      Clinically AI further seeks expedited discovery in this matter in order to preserve and protect its proprietary and trade secret information from actual and threatened misappropriation by Owens, as well as to safeguard its valuable relationships with key employees, customers, and referral sources from unlawful interference by Defendant.  *See* Rule 26(d), Fed. R. Civ. P.

3.      Clinically AI is a healthcare company that offers a specialized behavioral health AI platform designed to automate clinical documentation, reduce compliance risks, and enhance care through HIPAA-compliant, real-time transcription and auditing tools.

4.      Clinically AI's products assist behavioral health clinicians with note generation, customizable templates, and supervision tools, offering mobile capabilities for field-based services.

5.      Owens is the former Director of Small and Medium Business ("SMB") sales for Clinically AI. Owens abruptly resigned from his position with Clinically AI on March 31, 2026. In willful disregard of his continuing contractual, statutory, and common law obligations to Clinically AI, Owens *immediately* accepted employment in a leadership role with a competitor of Clinically AI, whom he has refused to identify.

6.      Following Owens' departure, Clinically AI learned that Owens – in the weeks leading up to his abrupt departure – had downloaded literally hundreds of the Company's most highly proprietary, confidential and trade secret documents, including comprehensive customer lists, business plans, client master data sets, and partner referral agreements.

7.      Clinically AI's ongoing forensic investigation has revealed that Owens' willful misappropriation of the Company's intellectual property continued almost up to the moment of his resignation, with Owens downloading eight (8) highly proprietary files and systemically reviewing other highly proprietary content in a manner suggesting Owens was accessing and copying confidential, proprietary and trade secret data in a manner intended to evade detection in the final days of his employment.

8.      Critically, Owens' deliberate misappropriation of Clinically AI's proprietary information may have also included Protected Health Information ("PHI") subject to the

protections and requirements of The Health Insurance Portability and Accountability Act ("HIPAA") of 1996, 42 U.S.C. §§ 1320d, *et seq*.

9. Although Owens refused to identify his new employer, he confirmed that it is a healthcare AI company working in the very same highly specialized and competitive behavioral health AI space as Clinically AI.

10. Upon information and belief, Owens and his new employer intend to use Clinically AI's confidential, proprietary, and trade secret information to quickly gain market share at Clinically AI's expense and without incurring the significant effort and investment of time, expertise and money required to legitimately compete and establish market share on a fair and lawful basis.

11. Clinically AI submits that the above misconduct by Owens is merely the first to be discovered, and Owens has and intends to continue to engage in the targeting of Clinically AI's established customer and business relationships via the misappropriation of Clinically AI's intellectual property to benefit himself and his new employer at Clinically AI's expense.

12. Despite Clinically AI's repeated attempt to resolve this matter short of litigation, Owens has failed and refused to cooperate in the complete return and remediation of the Company's confidential, proprietary and trade secret information.

13. As a direct result of Owens' intentional misconduct, Clinically AI has suffered irreparable harm and continues to suffer the same in the form of actual and threatened misappropriation of its confidential information and trade secrets, damage to the Company's reputation and goodwill, loss of business opportunities, damage to relationships with customers, prospects and referral sources, and loss of market share.

14. Clinically AI has likewise suffered actual monetary damages, at an amount to be determined, resulting from Owens' misuse of Clinically AI's confidential and proprietary information, as well as the potential targeting of Clinically AI's customers, potential customers, and referral sources.

15. Absent immediate, preliminary, and permanent injunctive relief, Clinically AI has no adequate remedy at law.

## PARTIES, JURISDICTION, AND VENUE

16. Clinically AI is a Delaware corporation headquartered in San Diego, California.

17. Owens is a citizen and resident of the State of South Carolina who, upon information and belief, presently resides at 574 Long Ridge Drive, Lexington, South Carolina.

18. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff has claims for misappropriation of trade secrets under the DTSA. This Court has pendent or supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367. This Court also has diversity jurisdiction over this action, as complete diversity exists between the parties and the amount in controversy requirement is met.

19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant Owens is subject to the personal jurisdiction of this Court, or in the alternative, because a substantial part of the events giving rise to this dispute occurred within this district.

20. Venue is proper in this division because the events giving rise to this dispute occurred in the division.

21. Defendant Owens committed the acts complained of in violation of his contractual obligations to Clinically AI, which have caused and continue to cause harm to Clinically AI, in Lexington, South Carolina.

**FACTUAL ALLEGATIONS**

22.     Clinically AI is an AI native healthcare company that specializes in providing software products to state, county, and federally funded behavioral healthcare organizations for Medicaid patients and populations.

23.     Clinically AI's software products include, without limitation, AI-powered clinical documentation solutions (AI Scribes), medical chart auditing, and clinical supervision support to ensure compliance with federal, state and insurance compliance and licensing requirements.

24.     Clinically AI's platform is purpose-built for behavioral health—capturing the nuance of clinical conversations, streamlining workflows, and improving accuracy at scale. Customers range from solo providers to large enterprise networks, with the Company's AI platform designed to help behavioral health care providers reduce administrative burden, improve outcomes, and reclaim valuable care time; all within a secure, HIPAA-compliant environment.

25.     Clinically AI's proprietary platform is configurable to each specific customer's unique workflow, compliant with that customer's policies, and flexible enough to serve the full spectrum of behavioral health care – from outpatient therapy to large Certified Community Behavioral Health Clinics ("CCBHCs") with programs and services spanning the continuum of care.

26.     In the healthcare industry generally – and particularly the area of behavioral health – the nature of the data being collected is both highly sensitive and strictly regulated.  As a result, Clinically AI has established robust security framework and compliance obligations that are necessary to fulfill the Company's contractual and legal obligations to clients and patients.

27.     With an AI platform currently serving more than 25,000 providers across the United States, Clinically AI is one of the fastest growing AI companies in the country.

## OWENS' EMPLOYMENT WITH CLINICALLY AI

28.     Clinically AI hired Owens on or about November 19, 2025, as its Director of SMB.

29.     Prior to accepting this position at Clinically AI, Owens had been terminated from his position as the Director of Sales for AutoNotes, a general healthcare AI company.

30.     In fact, Owens reached out to Clinically AI's CEO seeking employment, explaining that he had been abruptly terminated by AutoNotes and was left without medical insurance only weeks away from his wife giving birth to their first child.

31.     In his role as Director of SMB for Clinically AI, Owens was heavily involved in the Company's strategic sales efforts including, but not limited to, provider organizations with fewer than 51 clinicians nationwide, focusing on areas such as data mining, messaging, and overall strategy for our the Company's enterprise marketplace.

32.     Owens' job responsibilities and key projects he worked on while employed by Clinically AI included, but were not limited to, the following:

- o   Developing and executing SMB sales strategy to drive new customer acquisition within the behavioral health market;

- o   Recruiting, managing, and coaching a team of SMB account executives and sales development representatives;

- o   Pipeline development, forecasting, and revenue reporting for the SMB market segment;

- o   Leading prospects through the full sales cycle from outreach and demo through contract execution;

- o   Collaboration with marketing, product, and customer success teams to optimize Clinically AI's go-to-market efforts;

- o   Monitoring industry trends, competitive activity, and regulatory changes within the behavioral health marketplace;

o  Defining and tracking Key Performance Indicators ("KPIs") such as including Monthly Recurring Revenue ("MRR"), Customer Acquisition Cost ("CAC"), churn, and net revenue retention;

o  Identifying and developing channel partnerships to expand Clinically AI's SMB market reach; and

o  Representing the SMB business segment internally within the Company, advocating for product features and resources that serve smaller practice customers.

33.    Owens' job duties as Director of SMB were not tied to a specific geographic location; instead, Owens' responsibilities reached across Clinically AI's national marketplace and national sales force.

34.    As the Director of SMB, Owens was the face of Clinically AI to its customers, potential customers, and referral sources in the market.

35.    The behavioral health AI solution industry is extremely competitive and Clinically AI's success in this business is dependent in part on its ability to service and develop relationships with its customers. In this industry, strategies for effectively engaging with customers are a critical component to success.

36.    Clinically AI expends considerable resources and effort to (a) identify and effectively market to potential customers and referral sources, (b) foster its relationship and communication with customers, (c) maintain and deepen its relationship with existing referral sources, (d) market its brand and foster goodwill, and (e) develop its business.

37.    The information utilized to carry out Clinically AI's aforementioned business strategies is valuable, confidential, and proprietary to Clinically AI, and is not generally known in the public domain.

38.    The information has significant economic value to Clinically AI and would be of significant economic value to competitors in the industry.

39.     As a result of his employment in this critical strategic sales role for Clinically AI, the Company entrusted Owens with unfettered access to its HIPAA protected data, confidential, proprietary, and trade secret business information, including, without limitation, information related to the Company's proprietary designs, products, procedures, technology, methodologies, and processes, both within the development, marketing and distribution areas, as well as information related to the Company's customers, potential customers and referral sources, including specialized marketing materials, tactics, and strategic planning (hereinafter referred to as Clinically AI's "Company Confidential Information").

40.     Specifically, Clinically AI's Company Confidential Information to which Owens had access to during his employment with the Company included, but was not limited to: technical data; research; product plans; customer lists (including identity and contact information for customers and prospective customers with curated information regarding customer preferences and historical transaction data); product pricing and methodology; proprietary software; developments; inventions; discoveries; ideas; processes; formulas; technology; designs; drawings; engineering; hardware configuration information; marketing; finances (such as sales and profits); and strategies and research regarding product development and sales.

41.     Clinically AI's Company Confidential Information derives independent economic value from not being generally known to or readily ascertainable by proper means by the public, and Clinically AI takes reasonable steps to preserve the secrecy of this information, including, but not limited to, by restricting access to such materials to only those employees who need access in the scope of their work for the Company; securing the hardware, software, and network upon which such materials are stored; and barring distribution or reproduction of materials containing

any information which relates to Clinically AI's Company Confidential Information to outside individuals.

42.     Clinically AI's efforts to maintain the secrecy and confidentiality of its information further include, but are not limited to, the implementation of data access controls via user accounts with password requirements and periodic expiration dates.

43.     Clinically AI is a Systems and Operations Controls 2 ("SOC2 Type II") company with third party audits conducted yearly. The Company also deploys periodic penetration testing of Clinically AI's systems – which is beyond best practice in terms of security framework alignment and posture – and the Company deploys antivirus software and Web Application Firewalls ("WAFs") across all data.

44.     Employees are provided with user accounts that are granted access to data as is appropriate and necessary by the employee's department and/or discipline. Employees receive annual cyber security and awareness training, HIPAA and personal health information ("PHI") training, and Clinically AI engages in periodic phishing tests to determine training effectiveness and to identify needs for additional training.

45.     In addition, Clinically AI utilizes network firewalls to protect company servers, separating internet accessible systems from internal network resources, and providing guest Wi-Fi connectivity that is separate from the company network. Clinically AI has also implemented email, web, and endpoint protection to protect its computing environment and information.

46.     Clinically AI's IT department monitors potential issues and takes appropriate action, such as requiring password changes when unusual user activity is seen or reported, investigating, and removing possible malicious emails, as well as investigating and resolving peculiar network activity.

**OWENS' AGREEMENT WITH CLINICALLY AI**

47.     To further safeguard the Company's assets, key employees like Owens are required to sign restrictive covenant agreements.  Owens signed a Proprietary Information and Inventions Agreement (the "Agreement") on December 1, 2025, as an express condition of his initial employment.  A true and correct copy of Owens' Agreement is attached hereto as **Exhibit A**.

48.     Critically, the promises contained in Owens' Agreement with Clinically AI merely reinforce and supplement the Company's rights and Owens' obligations established as a matter of law pursuant to the DTSA and the Trade Secrets Act.

49.     The Agreement clearly sets forth the confidential and proprietary nature of Clinically AI's Company Confidential Information as well as the Company's rights and expectations as to the continued protection of this information; specifically including Owens' promise to refrain from removing, retaining or using any Company Confidential Information without Clinically AI's express written permission and that, upon separation from employment with Clinically AI, he would immediately deliver to the Company, and not keep in his possession, use, recreate, or deliver to anyone else, any Company Confidential Information.  (Agreement at § 1.2.)

50.     Owens' obligations in this specific regard extend to any Company Confidential Information stored or copied onto any personal "Electronic Media Equipment," defined to include such diverse items as computers, external storage devices, thumb drives, mobile devices (including, but not limited to smart phones, tablets, and e-readers). (Agreement at § 7.D.)

51.     The Agreement defines Clinically AI's Company Confidential Information, in pertinent part, as follows:

> [I]nformation (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile,

discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with the Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Company Confidential Information.

(Agreement at § 3.A.)

52. Per the Agreement, Company Confidential Information also expressly includes, but is not limited to, trade secret information as defined by the DTSA and Trade Secrets Act. (Agreement at § 3.A.)

53. In recognition of the intrinsic value of Clinically AI's Company Confidential Information with which Owens was entrusted as the Company's Director of SMB, and the unfair business advantage that information could provide him and any direct competitor of the Company if misused, Owens also agreed to certain narrowly tailored covenants protecting Clinically AI from unfair competition.

54. Specifically, Owens agreed that for a twelve (12) month period following the termination of his employment with Clinically AI, he would not, directly or indirectly, "solicit or recruit or attempt to solicit or recruit" any Covered Individual to leave their employment or stop providing services to the Company or, on behalf of a Competing Business, actually or attempt to "induce, encourage or assist with hiring" of any Covered Individual. (Agreement at § 5.B.)

55. During this same restricted period, Owens also agreed that he would not:

[O]n behalf of a Competing Business, directly or by assisting or directing others: (a) solicit business or sales, for the same or similar products or services as provided by the Company, from any Covered Customer; or (b) knowingly engage in any conduct that is intended to cause, or could reasonably be expected to cause the Covered Customer to stop or reduce doing business with the Company, or that would involve diverting business opportunities away from the Company.

11

(Agreement at § 5.F.)

56.    The terms "Competing Business," "Covered Customer" and "Covered Individual" are each narrowly and appropriately defined in the Agreement to protect Clinically AI's legitimate business interests and to ensure that these corresponding continuing obligations are valid and enforceable pursuant to South Carolina law.  (Agreement. at § 5.A.)

## OWENS' MISCONDUCT IN VIOLATION OF CLINICALLY AI'S RIGHTS

57.    Within weeks of joining Clinically AI as the Company's Director of SMB, Owens requested and was granted four (4) weeks of fully paid parental leave, corresponding to the birth of his child.

58.    Owens returned to work on or about February 13, 2026.  Upon his return, Owens struggled in terms of demonstrable sales activity and general productivity.  As a result, Clinically AI's CEO would meet with Owens frequently to offer him additional direct assistance and support.

59.    Clinically AI's CEO scheduled one such meeting for Tuesday, March 31, 2026.  At the commencement of the meeting, Owens abruptly announced that he would be "leading" the meeting – which was, like most Company meetings, being automatically recorded via a digital AI assistant – and that he had accepted a job offer in a leadership position from another company and was resigning from his employment effective immediately.

60.    When asked where he was going to work, Owens flatly refused to identify his new employer.  Owens stated he didn't believe his new employer was competitive with respect to Clinically AI's business; however, he later admitted that his new employer was *also* an AI company operating in the behavioral healthcare industry, thereby directly contradicting his earlier assertion.

61.    As per Company practice and as rendered urgent by the circumstances surrounding Owens' abrupt resignation, Clinically AI's Information Technology ("IT") Department conducted an audit of Owens' Google Workspace and Google Drive Activity from the commencement of his employment on November 23, 2025, through the date of his resignation on March 31, 2026.

62.    The IT Department's forensic investigation revealed that Owens had engaged in *mass* downloading of the Company's most highly proprietary Company Confidential Information, including trade secret information and, potentially, PHI as defined and governed by HIPAA.

63.    Specifically, the Company's forensic investigation – which is continuing – revealed that Owens downloaded 514 separate files in the weeks leading up to his abrupt resignation, including comprehensive customer lists, confidential business plans, customer master data sets, and partner referral agreements.

64.    Notably, during the last week of his employment with Clinically AI, Owens apparently devoted the majority of his time to stealing Clinically AI's Company Confidential Information.

65.    For example, during the last six (6) days of his active employment, Owens logged only seven (7) emails and literally zero phone calls.  During this same time period, however, Owens engaged in the following activity unrelated to any actual work on behalf of Clinically AI:

- o  Eight (8) file downloads, including Company dashboard metrics, customer transcripts, request for proposal ("RFP") content, and competitive intelligence documents;

- o  Six (6) new files created, including spreadsheets consolidating Company data and prospect lists;

- o  Nine (9) file rename operations, including prefixing company dashboard files with "Open Minds";

- o  Systematic review of 20+ customer call transcripts, internal meeting transcripts, and Company strategy documents;

o   After-hours activity reviewing internal meeting transcripts;

o   26 "Item Content Accessed" events on sensitive files where content could be extracted via copy/paste with no audit trail;

o   Access and methodical review of transcripts, lists of prospects outside of his assigned scope and sales opportunities assigned to other Clinically AI sales representatives – including materials governed by strict client-specific non-disclosure obligations.

o   Multiple accesses from March 27-30, 2026, to Clinically AI Product SKUs[1] (complete pricing and tier structures) created by the Company's CEO, content viewable and copyable without triggering download events;

o   Methodical review of customer transcripts followed by view-edit-download sequences on two key files, then review of Clinically AI's sales strategy deck, all occurring on March 31, 2026, shortly before Owens' resignation; and

o   Deletion of multiple files that contained important Company Confidential Information.

66.   Owens' activities during the last few days of his employment are particularly troubling.

67.   On March 26 and 27, 2026, Owens created a file entitled "Clinically AI Dashboard Data As Of 11042025.xlsx," containing Company performance metrics from November 2025. The next day (March 27), Owens created a second file "Clinically AI_Dashboard Data As Of 03162026.xlsx" containing Clinically AI's performance metrics current through March 2026.

68.   At 7:57 AM on March 27, Owens downloaded both files within seven (7) seconds of each other and then renamed them with the prefix "Open Minds" only minutes later.[2] The

---

[1] A SKU, or Stock Keeping Unit, is a unique, company-specific alphanumeric code assigned to a product to track inventory, pricing and sales information.

[2] Upon information and belief, "Open Minds" is a reference to OPEN MINDS, a health and human services group that sponsors frequent industry conferences on a variety of topics, including

14

combination of creation, download, and renaming obviously suggests Owens was gathering Clinically AI's proprietary data for external use.

69.     On his final day of employment, at 11:24 AM PT, Owens executed a rapid view-download sequence on two files he had created during this period:

- o 'Ryan - CMCH/CCBHC Cheat Sheet' (a competitive intelligence document containing federally funded Community Mental Health Centers and Certified Community Mental Center market data, downloaded at 11:24:33 AM); and

- o 'State Associations' (a Company spreadsheet of state behavioral health association contacts, which Owens edited at 11:24:59 AM then downloaded at 11:25:00 AM (1 second later). This document includes the direct contact information, including email, cell phone numbers, titles, and notes for all 50 state behavioral health organizations. A very valuable list of resources which could impact market penetration.

70.     This view-edit-download pattern on the last day of employment – literally two (2) hours prior to resignation – is consistent with, and strongly suggests, final data extraction.

71.     Over March 27-31, Owens also engaged in a systemic review of highly sensitive documents in a manner inconsistent with the performance of his legitimate job duties, but highly suggestive of deliberate exfiltration.

72.     Owens' conduct in this regard is particularly concerning with respect to his access and review of certain highly proprietary and commercially sensitive files.  For example, Owens accessed and reviewed the file "Clinically Product SKUs," a file created and maintained by Clinically AI's CEO, four (4) separate times during the final two (2) days of his employment.

---

technology and AI, marketed specifically to healthcare providers. Clinically AI believes that Owens is therefore either planning a presentation for his new employer at the OPEN MINDS show or, alternatively, that he was renaming documents with this title in order to evade suspicion and appear innocuous.

15

73.     This file contains Clinically AI's complete pricing, SKU identifiers, and tier structures – highly sensitive competitive information that would cause the Company direct and irreparable commercial harm in the hands of a competitor.

74.     In total, there were 26 "Item content accessed" events by Owens during this three (3) day period across the Company's most commercially sensitive files, actions that evidence Owens' efforts to exfiltrate Clinically AI's proprietary and trade secret information via a "copy/paste" method designed to leave no trace in the Company's audit log.

75.     Additionally on January 1, 2026, Owens made 76 files "public," making these files – which, upon information and belief, contain recordings, transcripts and other Company Confidential Information – accessible to anyone with a link to these documents. In other words, any individual with a link to these files and an internet connection is free to access and download these highly proprietary files from any location.

76.     Owens has no legitimate reason to download or remove Clinically AI's highly proprietary Company Confidential Information, other than to use that stolen data to compete directly against Clinically AI while providing an unfair and unlawful advantage to himself and his new employer.

77.     Upon information and belief, Owens has already unlawfully transferred all of the foregoing Company Confidential Information (and almost certainly more) to his personal devices and accounts.

78.     Upon learning of Owens' above-described wrongdoing, Clinically AI immediately sent him a letter on April 1, 2026, reminding him of his contractual and legal obligations to Clinically AI, asking that he reaffirm his commitment to abide by the same and, critically, insisting

that he make immediate arrangements to return any Company Confidential Information in his possession or control.  A true and correct copy of this letter is attached as **Exhibit B**.

79.    Owens responded the following morning, April 2, 2026, via email.  A true and correct copy of this email is attached hereto as **Exhibit C**.  In his email, Owens reaffirmed his continuing obligations to Clinically AI and stated that he had conducted a "good faith review" of his personal devices and that he did not have any Company Confidential Information.  (Ex. C.) This representation is demonstrably false, as evidence by Owens' above-described exfiltration of Company Confidential Information.

80.    Clinically AI responded to Owens' email immediately.  A true and correct copy of this April 2, 2026,  email is attached hereto as **Exhibit D**.  In so doing, Clinically AI explained that, due to the clear evidence of his misappropriation of Company Confidential Information – including potential PHI – the Company needed to know the identity of Owens' new employer so that Clinically AI could put them on notice of its concerns.  (Ex. D.)

81.    Clinically AI also asked that Owens consent to an examination and review – to be conducted at the Company's expense – of any personal devices and accounts within his custody and control to ensure that all Company Confidential Information is returned to Clinically AI and that no Company Confidential Information had been transferred, copied, or retained.  (Ex. D.)

82.    Clinically AI also informed Owens that, in light of the seriousness of this matter, his refusal to comply would leave the Company with no choice but to seek protection from the Court.  (Ex. D.)

83.    Clinically AI asked that Owens respond by 4 P.M.  (Ex. D.)

84.    Owens responded to Clinically AI's request at 4:38 PM.  A true and correct copy of this email is attached hereto as **Exhibit E**.  Owens again failed to identify his new employer and

17

also failed to respond to the Company's request for a forensic audit, stating only that "[g]iven the requests outlined, I am in the process of retaining legal counsel."  (Ex. E.)

85.     The following morning, Owens sent another email in which he provided an "update" that he was "not joining a competitor at this time," and reiterated that he was in the process of obtaining legal counsel.  A true and correct copy of this April 3, 2026, email is attached hereto as **Exhibit F**.

86.     Clinically AI again immediately followed up with Owens via email, stressing that his decision to retain counsel did not suspend, delay, or otherwise toll his obligations to the Company.  A true and correct copy of this email is attached hereto as **Exhibit G**.

87.     In a final good faith effort to avoid litigation, Clinically AI again asked that Owens identify his prospective new employer – with whom he initially claimed he had already accepted a leadership role – and that he consent to a forensic examination of his personal devices and accounts for the purpose of ensuring all Company Confidential Information wrongfully in his possession was returned.  (Ex. G.)

88.     Clinically AI again offered to pay for all costs associated with this review and, critically, expressly cautioned Owens that he failure to promptly comply with these requests would leave the Company no choice but to seek protection from the Court.  (Ex. G.)  Toward that end, Clinically AI informed Owens as follows:

> **Consequences of Continued Non-Cooperation**.  Should you fail to respond substantively to these requests (including disclosure of your new employer and written commitment to forensic cooperation) by **no later than 12 Noon Monday, April 6, 2026**, we will have no choice but to file an action for immediate injunctive relief, including the imposition of a forensic protocol and an award of all available damages, including actual damages, exemplary damages for willful misappropriation under the South Carolina Uniform Trade Secrets Act, and attorneys' fees and costs pursuant to the Act and Section 11.F of your Agreement.

(Ex. G.)

18

89.     When Owens subsequently failed to timely respond to the foregoing request, Clinically AI's CEO, Ross Young, and the Company's co-founder, Elijah Lipsky, personally reached out to Owens on Monday, April 6, 2026, in the hopes of convincing him to voluntarily comply with his obligations.

90.     Young and Lipsky's good faith effort to resolve this matter were unsuccessful, however, as Owens remained evasive, again refusing to identify his prospective new employer and inexplicably refusing to cooperate with Clinically AI to ensure the Company's Confidential Information was safeguarded and returned.

91.     Upon information and belief, Owens has already used and/or clearly intends to use Clinically AI's Company Confidential Information and trade secrets to target Clinically AI's customers, potential customers, and referral sources in improper competition.

92.     Critically, Clinically AI fears that Owens' misappropriation of Clinically AI's Confidential Information and trade secrets and further unlawful conduct is even more pervasive and far-reaching than the Company is currently aware, given the great lengths Owens has gone to in order to evade detection of his illicit conduct.

93.     Owens' above-described misconduct is in direct violation of the law and his contractual promises to Clinically AI as set forth in his Agreement, as well as his duty of loyalty to Clinically AI.

94.     Upon information and belief, the above misconduct by Owens is merely the first to be discovered, and Owens has and continues to engage in the deliberate misappropriation of Clinically AI's Company Confidential Information and trade secrets, as well as a direct targeting of Clinically AI's established customer relationships in order to benefit himself and his new

employer and to expand market share without incurring the time and expense necessary to develop the methodologies, and customer knowledge and specialization required to sustain such a business.

95. As a direct result of Owens' intentional wrongful conduct, Clinically AI has suffered irreparable harm and continues to suffer same in the form of actual and threatened misappropriation of its Company Confidential Information and trade secrets, damage to reputation and goodwill, loss of business opportunities, damage to relationships with customers and referral sources, and loss of market share.

96. At this time, the full extent of Owens' trade secret theft and other misconduct in violation of Clinically AI's rights is unknown.

97. Absent injunctive relief, Clinically AI has no adequate remedy at law.

### FOR A FIRST CAUSE OF ACTION
*(Misappropriation of Trade Secrets in Violation of the*
*Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq.)*

98. Clinically AI realleges and incorporates the preceding paragraphs as if set forth fully herein.

99. While at Clinically AI, Owens had direct and intimate knowledge of Clinically AI's trade secrets, which are exclusive to Clinically AI and are not generally known in the industry.

100. During his employment with Clinically AI, Owens was afforded access to Clinically AI trade secrets having actual or potential independent economic value from not being generally known to the public or other persons who can obtain economic value from their disclosure or use. Without limitation, this information includes: technical data; research; product plans; customer lists (including identity and contact information for customers and prospective customers with curated information regarding customer preferences and historical transaction data); proprietary software; developments; inventions; discoveries; ideas; processes; formulas;

20

technology; designs; drawings; engineering; hardware configuration information; marketing; finances (such as sales and profits); and strategies and research regarding product development and sales.

101. Clinically AI's trade secret information is not public and is made available only to key employees, such as executives and a select number of sales representatives, on a need-to-know basis.

102. As described above, Clinically AI takes reasonable measures to keep the information secret. Without limitation, Clinically AI has utilized password protected computer systems to ensure that Clinically AI's proprietary and confidential information is not improperly used, disclosed, or disseminated.

103. Among other measures, employees who are given access to such trade secret information are required to sign certain agreements, such as the Agreement Owens signed, or similar agreements in order to further protect Clinically AI's trade secrets.

104. Clinically AI's trade secrets constitute trade secrets under the DTSA because they contain Clinically AI's proprietary customer lists and information regarding Clinically AI's customer needs, pricing, and other related information.

105. Clinically AI's trade secrets derive independent economic value by not being known to or readily ascertainable by proper means by competitors.

106. Clinically AI did not give Owens permission to share its trade secrets with anyone outside of Clinically AI.

107. Upon information and belief, Owens unlawfully misappropriated Clinically AI's trade secrets while employed by Clinically AI, in preparation to unlawfully compete with Clinically AI and while under a duty to maintain their secrecy.

21

108. Upon information and belief, Owens used and disclosed Clinically AI's trade secrets for and on behalf of himself and for the benefit of his new employer.

109. Upon information and belief, Owens is using Clinically AI's trade secrets to target Clinically AI's customers and to compete unfairly in the behavioral health AI industry, capitalizing on Clinically AI's extraordinary investment of time, resources, and goodwill.

110. As a result of Owens' misappropriation of Clinically AI's trade secrets, Clinically AI has suffered irreparable harm in the form of actual and threatened misappropriation of its trade secrets, injury and harm to its goodwill and business reputation, and loss of actual and prospective customers.

111. Clinically AI also has and continues to suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

112. Clinically AI has no adequate remedy at law.

113. Accordingly, Clinically AI requests that this Court issue a Temporary Restraining Order and a Preliminary Injunction Order enjoining Owens, directly or indirectly, alone or in concert with others, from:

(A) Possessing, using, disclosing, or transmitting Clinically AI's Confidential Company Information and trade secrets as specifically identified herein and providing that all original documents, records, materials or devices containing or reflecting such information, and all copies thereof, be *immediately* returned to Clinically AI; *and providing that*

(B) Defendant shall identify to counsel for Clinically AI, no later than two (2) business days from the date of the Court's Order, each and every customer, potential customer, referral source, or employee of Clinically AI whom Owens solicited, serviced or called upon for his own benefit or for the benefit of his new employer, directly or indirectly, and the full source, nature and substance of any Clinically AI Confidential Information or trade secrets, as identified herein, that Owens may have used at any time subsequent to Owens' employment with Clinically AI or have disclosed to any third party

      during that timeframe and, where applicable, the names, dates and contact information for the individual or entity to whom said disclosure was made, including without limitation parties internal to his current employer and any affiliate or parent entity thereof; ***and requiring that***

(C)     Defendant shall refrain from the destruction, alteration, transmittal, or movement of ***any*** documents, in whatever form, which may contain or reflect Clinically AI's Company Confidential Information or trade secrets so that said documents may be gathered and reviewed by counsel for Clinically AI and this Court; and

(D)     Any and all other such acts as the Court deems appropriate for injunctive relief.

114.    Clinically AI also requests an Order granting Clinically AI expedited discovery in order to ascertain the full nature and extent of Owens' activities referenced herein, including, without limitation, the nature and extent of Clinically AI's Company Confidential Information or trade secrets Owens may have misappropriated and the nature and extent of Clinically AI's employees, customers, and/or referral sources Owens may have solicited using said information.

115.    Clinically AI asks that it be allowed to immediately serve all discovery allowed under the Federal Rules of Civil Procedure, including the deposition of Owens, and to be entitled to responses to any written discovery within fifteen (15) business days of the service of said discovery.

116.    Clinically AI further requests an Order requiring Owens to enter into a Consent Protocol for the forensic analysis of electronic discovery in order to ascertain the full nature and extent of his activities referenced herein, including, without limitation, the nature and extent of Clinically AI's Company Confidential Information or trade secrets Defendant may have misappropriated and the nature and extent of Clinically AI's employees, customers, and/or referral sources Defendant may have solicited using said information.

117.    Clinically AI is likewise entitled to an award of all actual, direct, and consequential damages sustained as a result of Owens' misappropriation, an award equal to any profits earned by Defendant on the sales of goods to customers accessed through the misappropriation of Clinically AI's trade secret information, exemplary damages, and an award of costs and reasonable attorneys' fees incurred by Clinically AI in this action. (18 U.S.C. § 1836(b)(3)(B).)

**FOR A SECOND CAUSE OF ACTION**
*(Misappropriation of Trade Secrets in Violation of the South Carolina Trade Secrets Act, S.C. Code Ann. §§ 39-8-10, et seq.)*

118.    Clinically AI realleges and incorporates the preceding paragraphs as if set forth fully herein.

119.    While at Clinically AI, Owens had direct and intimate knowledge of Clinically AI's trade secrets, which are exclusive to Clinically AI and are not generally known in the industry.

120.    During his employment with Clinically AI, Owens was afforded access to Clinically AI's trade secrets having actual or potential independent economic value from not being generally known to the public or other persons who can obtain economic value from its disclosure or use. Without limitation, this information includes customer and referral source information and compilations; price lists and pricing structures; marketing and sales information, including specialized brochures, presentations, customer processes, and marketing programs unique to the industry; business plans and financial information; product designs and prototypes; and strategies and research regarding product developments and nationwide sales strategies.

121.    Clinically AI's trade secret information is not public and is made available only to key employees, such as executives and a select number of sales representatives, on a need-to-know basis.

24

122. Such information constitutes trade secrets pursuant to the provisions of the Trade Secrets Act, S.C. Code Ann. §§ 39-8-10, *et seq*.

123. Such information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

124. Clinically AI has engaged in efforts that are reasonable under the circumstances to maintain the secrecy of the records and information described herein. Without limitation, Clinically AI has utilized password protected computer systems to ensure that Clinically AI's proprietary and confidential information is not improperly used, disclosed, or disseminated.

125. Employees who are given access to such trade secret information are required to sign certain agreements, such as the Agreement Owens signed, or similar agreements in order to further protect Clinically AI's trade secrets.

126. Upon information and belief, Owens has intentionally misappropriated and used, and unless restrained will continue to use Clinically AI's trade secrets to cause significant harm to the Company in the marketplace in order to unlawfully benefit Owens and his new employer.

127. Upon information and belief, Owens used and disclosed Clinically AI's trade secrets for and on behalf of himself and his new employer.

128. Upon information and belief, Owens has used and disclosed Clinically AI's trade secret information by using same to conduct competing business to the detriment of Clinically AI, including without limitation the actual and threatened misappropriation of information related to Clinically AI's proprietary customer and referral source lists, marketing strategies, and related information.

129.     Owens' actions constitute actual and threatened misappropriation of trade secrets in violation of the Trade Secrets Act.

130.     As a result of all Owens' actual and threatened misappropriation, Clinically AI has been damaged, and Owens has been unjustly enriched.

131.     Unless restrained, Owens will continue to misappropriate Clinically AI's trade secrets, causing continuing and irreparable injury to Clinically AI's business as more fully set forth above and for which Clinically AI has no adequate remedy at law.

132.     Pursuant to the Trade Secrets Act, Clinically AI seeks a preliminary and permanent injunction barring Owens' continued actual and threatened misappropriation of Clinically AI's trade secrets as set forth hereinabove. (S.C. Code Ann. § 39-8-30.)

133.     Clinically AI also seeks an award of actual damages incurred as a result of such wrongful acts, as well as an award of damages for the unjust enrichment caused by the misappropriation, or the imposition of a reasonable royalty. (S.C. Code Ann. § 39-8-40.)

134.     As a result of Owens' willful and malicious misappropriation, Clinically AI seeks an award of exemplary damages.

135.     Clinically AI also seeks an award of punitive damages and as permitted by the Trade Secrets Act, its reasonable costs and attorneys' fees incurred in this action pursuant to S.C. Code Ann. § 39-8-80 and 18 U.S.C. § 1836(b)(3)(B).

**FOR A THIRD CAUSE OF ACTION**
(*Breach of Contract*)

136.     Clinically AI realleges and incorporates the preceding paragraphs as if set forth fully herein.

137.     Owens entered into valid contractual obligations with Clinically AI in the form of the Agreement.

26

138.     Clinically AI has fully performed all of its obligations to Owens.

139.     In spite of Clinically AI's good faith performance, Owens has breached these contractual obligations by, among other things, misappropriating Clinically AI's trade secrets and Company Confidential Information by using same to conduct competing business to the detriment of Clinically AI, including without limitation the actual and threatened misappropriation of information related to the Company's proprietary products and processes, pricing, and marketing and business strategies, as well as the actual and threatened use of Clinically AI's proprietary customer and referral source lists and related information.

140.     Upon information and belief, Owens has also improperly disclosed Clinically AI's Company Confidential Information and trade secrets to his new employer.

141.     As a result of Owens' actual and threatened breaches of his contractual obligations pursuant to the Agreement, Clinically AI has been damaged, and Owens and his new employer have been unjustly enriched.

142.     Unless restrained, Owens will continue to breach his contractual obligations to Clinically AI and compete unfairly with Clinically AI, causing continuing and irreparable injury to Clinically AI's business for which it has no adequate remedy at law.

143.     In addition to the injunctive relief set forth above, Clinically AI seeks the entry of a Preliminary Injunction Order enjoining Owens from, either directly or indirectly:

> (A)     Participating in, managing, consulting with, or rendering services that are the same as or similar in function or purpose to any services he provided to Clinically AI during his employment, for any "Competing Business" (as defined in Section 5.A of the Agreement) within the United States;
>
> (B)     Soliciting business or sales for the same or similar products or services as provided by Clinically AI from any "Covered Customer" (as defined in Section 5.A of the Agreement) or engaging in any conduct that may cause a Covered Customer to

stop or reduce its business with Clinically AI or that would involve diverting business opportunities away from the Company; and

(C) Soliciting, inducing, recruiting, or encouraging any "Covered Individual" (as defined in Section 5.A of the Agreement) to terminate their relationship with Clinically AI.

144. Clinically AI is also entitled to judgment against Owens for its actual, general, compensatory, incidental, special, and consequential damages relating to Owens' contractual breaches.

## FOR A FOURTH CAUSE OF ACTION
*(Unjust Enrichment)*

145. Clinically AI realleges and incorporates the preceding paragraphs as if set forth fully herein.

146. Upon information and belief, Owens has wrongfully taken Clinically AI's business opportunities, as well as Company Confidential Information and trade secrets.

147. Permitting Owens to retain the benefit of the use of these opportunities and valuable information without Clinically AI's authorization would be inequitable.

148. Owens has been unjustly enriched and should pay restitution such that Clinically AI is returned to the status quo.

149. Owens has further been unjustly enriched in the form of the compensation and benefits provided to him during his employment with Clinically AI, all of which was conditioned upon his agreement to honor the restrictive covenants set forth in his Agreement.

150. Clinically AI is therefore entitled to recover the full amount of these payments from Owens, in addition to the above-demanded restitution.

28

**FOR A FIFTH CAUSE OF ACTION**
*(Breach of the Duty of Loyalty)*

151.    Clinically AI realleges and incorporates the preceding paragraphs as if set forth fully herein.

152.    Owens owed Clinically AI a duty of loyalty under South Carolina law and a corresponding duty to ensure that his conduct did not breach the trust of Clinically AI, including, without limitation, his covenants to Clinically AI set forth in his Agreement.

153.    Owens' duty of loyalty is also codified in Section 6.A of his Agreement.  (Ex. A.)

154.    Clinically AI placed special trust and confidence in Owens, investing substantial time and resources in him, and granting him unfettered access to Clinically AI's Confidential Information and trade secrets, as well as its customers, potential customers, and referral sources.

155.    Owens accepted such trust and confidence.

156.    Owens has breached his duty of loyalty to Clinically AI by misappropriating Clinically AI's Confidential Information and trade secrets and, upon information and belief, actively assisting his new employer, a direct competitor of Clinically AI, during and subsequent to his employment with Clinically AI as specifically described hereinabove.

157.    Owens' deliberate misconduct in this regard is merely the first to be discovered.

158.    As a direct and proximate result of his breaches, Clinically AI has suffered, and will continue to suffer monetary damages.

159.    Clinically AI is entitled to judgment against Owens for its actual, general, compensatory, incidental, special, and consequential damages, as well as punitive damages.

160.    Clinically AI is also entitled to recover from Owens all wages paid to him during any period of his employment in which he was engaged in acts disloyal to Clinically AI.

29

**FOR A SIXTH CAUSE OF ACTION**
*(Conversion)*

161.    Clinically AI realleges and incorporates the preceding paragraphs as if set forth fully herein.

162.    Clinically AI has an ownership interest in and is entitled to possession of all documents and materials, in whatever form, related to its business, and has an ownership interest in its Confidential Information and trade secrets as described hereinabove.

163.    Upon information and belief, Owens has wrongfully obtained electronic files, data, and documents without the authorization of Clinically AI, including without limitation, documents containing or reflecting Clinically AI's Confidential Information and trade secrets, and Owens has been unjustly enriched by virtue of his use of same.

164.    The above acts of Owens constitute a conversion of these electronic files, data, documents, and tangible materials.

165.    Clinically AI has suffered actual damages as a direct and proximate result of this conversion.

166.    Clinically AI is entitled to judgment against Owens for the amount of the Company's actual, general, compensatory, incidental, special, and consequential damages relating to such conversion.

167.    Owens' actions were reckless, willful, and wanton and Clinically AI is further entitled to judgment against Owens for punitive damages.

**WHEREFORE**, Clinically AI prays for judgment against Owens providing it with the following relief:

1.    A Temporary Restraining Order and a Preliminary Injunction Order enjoining Owens, directly or indirectly, alone or in concert with others, from:

30

(A)     Possessing, using, disclosing, or transmitting Clinically AI's Confidential Company Information and trade secrets as specifically identified herein and providing that all original documents, records, materials or devices containing or reflecting such information, and all copies thereof, be *immediately* returned to Clinically AI; *and providing that*

(B)     Defendant shall identify to counsel for Clinically AI, no later than two (2) business days from the date of the Court's Order, each and every customer, potential customer, referral source, or employee of Clinically AI whom Owens solicited, serviced or called upon for his own benefit or for the benefit of his new employer, directly or indirectly, and the full source, nature and substance of any Clinically AI Confidential Information or trade secrets, as identified herein, that Owens may have used at any time subsequent to Owens' employment with Clinically AI or have disclosed to any third party during that timeframe and, where applicable, the names, dates and contact information for the individual or entity to whom said disclosure was made, including without limitation parties internal to his current employer and any affiliate or parent entity thereof; *and requiring that*

(C)     Defendant shall refrain from the destruction, alteration, transmittal, or movement of *any* documents, in whatever form, which may contain or reflect Clinically AI's Company Confidential Information or trade secrets so that said documents may be gathered and reviewed by counsel for Clinically AI and this Court; and

(D)     Any and all other such acts as the Court deems appropriate for injunctive relief.

2.     Clinically AI further requests that this Court issue a Preliminary Injunction Order enjoining Owens from, either directly or indirectly:

(A)     Participating in, managing, consulting with, or rendering services that are the same as or similar in function or purpose to any services he provided to Clinically AI during his employment, for any "Competing Business" (as defined in Section 5.A of the Agreement) within the United States;

(B)     Soliciting business or sales for the same or similar products or services as provided by Clinically AI from any "Covered Customer" (as defined in Section 5.A of the Agreement) or engaging in any conduct that may cause a Covered Customer to stop or reduce its business with Clinically AI or that would

involve diverting business opportunities away from the Company; and

(C) Soliciting, inducing, recruiting, or encouraging any of "Covered Individual" (as defined in Section 5.A of the Agreement) to terminate their relationship with Clinically AI.

3. Clinically AI also requests an Order requiring Owens to compensate Clinically AI for its reasonable costs and attorneys' fees incurred in this action pursuant to Section 11.F of his Agreement, as well as 18 U.S.C. § 1836 and S.C. Code Ann. § 39-8-80;

4. Clinically AI also requests an Order granting Clinically AI expedited discovery in order to ascertain the full nature and extent of Owens' activities referenced herein, including, without limitation, the nature and extent of Clinically AI's Confidential Information and trade secrets Owens may have misappropriated and the nature and extent of Clinically AI's employees, customers, potential customers, and referral sources Owens may have solicited using said information;

5. Clinically AI asks that it be allowed to immediately serve all discovery allowed under the Federal Rules of Civil Procedure, including the depositions of Owens, and to be entitled to responses to any written discovery within fifteen (15) business days of the service of said discovery;

6. Clinically AI further requests an Order requiring Owens to enter into a Consent Protocol for the forensic analysis of electronic discovery in order to ascertain the full nature and extent of Owens' activities referenced herein, including, without limitation, the nature and extent of Clinically AI's Confidential Information and trade secrets Owens may have misappropriated and the nature and extent of Clinically AI's employees, customers, potential customers, and referral sources Owens may have solicited using said information;

7.     Judgment against Owens for the amount of Clinically AI's actual, general, compensatory, incidental, special, and consequential damages relating to Owens' contractual breaches and breaches of his duty of loyalty; and

9.     Such other relief as the Court deems just and equitable.

Respectfully submitted,

**LITTLER MENDELSON, P.C.**

*/s/ William H. Foster*
William H. Foster
Federal Bar No. 6221
E-Mail: BFoster@littler.com
Katie E. Towery
Federal Bar No. 12861
E-Mail: KTowery@littler.com
110 E. Court Street / Suite 201
Greenville, SC 29601
(864) 775-3191

*Attorneys for Clinical Notes AI, Inc. d/b/a Clinically AI*

Greenville, South Carolina
April 14, 2026

33